# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRANKIE GREER,

        *Plaintiff*,
 and

SAN DIEGO UNION TRIBUNE,
LLC; PRISON LEGAL NEWS;
VOICE OF SAN DIEGO,

        *Intervenors-Appellees*,

 v.

COUNTY OF SAN DIEGO,

        *Defendant-Appellant*,

WILLIAM GORE, Sheriff; ALFRED
JOSHUA, M.D.; BARBARA LEE;
MACY GERMONO; FRANCISCO
BRAVO; CHRISTOPHER SIMMS;
MICHAEL CAMPOS,

        *Defendants*.

No. 23-55607

D.C. No.
3:19-cv-00378-
JO-DEB

OPINION

Appeal from the United States District Court
for the Southern District of California
Jinsook Ohta, District Judge, Presiding

Argued and Submitted August 14, 2024
San Francisco, California

Filed February 10, 2025

Before:  Susan P. Graber, Consuelo M. Callahan, and Lucy
H. Koh, Circuit Judges.

Opinion by Judge Graber;
Concurrence by Judge Graber;
Partial Dissent by Judge Koh

## SUMMARY[*]

### Attorney-Client Privilege

The panel reversed the district court's order to unseal documents from the County of San Diego's Critical Incident Review Board ("CIRB") that had been produced in an underlying civil rights action, and remanded with instructions to return and/or destroy the disputed documents because they were protected by the attorney-client privilege.

Frankie Greer brought an action against the County of San Diego under 42 U.S.C. § 1983, alleging that he suffered serious injuries while incarcerated in the San Diego Central Jail.  During discovery, he sought the production of documents related to in-custody deaths from the County's CIRB meetings.  The CIRB's stated purpose is to consult

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

with legal counsel when an incident occurs which may give rise to litigation, identify problem areas, and recommend remedial action to avoid future liability. The district court found that the requested documents were not protected by the attorney-client privilege because the CIRB serves multiple purposes unrelated to obtaining legal advice from counsel. The district rejected efforts to immunize documents from disclosure simply because an attorney was involved in an incident investigation. After Greer settled his claims with the County, various media organizations successfully moved to intervene for the purpose of unsealing the CIRB documents that had been produced in the litigation.

The panel held that the appeal was not moot even though the County had elected to produce the purportedly privileged CIRB documents. Because the panel could order the district court to direct intervenors' counsel and plaintiff's counsel to return or destroy their copies of the CIRB documents, particularly given that they received non-redacted versions, effective relief remained available.

The panel held that the attorney-client privilege applied to the disputed CIRB documents. The district court erred in determining that obtaining legal advice was not the primary goal of the CIRB meetings memorialized in the underlying reports. A lawyer's recommendations on both liability for past events and avoidance of future liability-creating events constitute legal advice. Both the participants in the CIRB and its critics consistently viewed the primary purpose of the CIRB as assessing legal liability for a past event and avoiding legal liability for future similar events.

The panel further rejected intervenors' alternative argument that even if the attorney-client privilege applied, the County waived that privilege by, among other things,

failing to establish an attorney-client relationship with every person who attended the CIRB meetings at issue. The Chief Legal Advisor's declaration stated that he was the legal advisor for the San Diego County Sheriff's Department as a whole, not just for the Sheriff alone. All participants in CIRB meetings were employees of the Sheriff's Department and, therefore, the attorney-client privilege attached.

Judge Graber concurred in order to address in greater detail how this court's precedents concerning review of the question whether the attorney-client privilege applies to a particular communication came to be in disarray, and to add a real-world perspective to the analysis of the attorney-client privilege.

Judge Koh agreed the case was not moot but otherwise dissented on three grounds. First, binding Ninth Circuit precedent provides that the clear error standard applies to the district court's factual finding that the primary purpose of the CIRB reports was not to obtain legal advice. The district court's factual finding on this score was not clearly erroneous, but to the contrary, supported by ample evidence in the record, including the County's policy manual, statements by County officials and, most importantly, the CIRB reports themselves. Indeed, some CIRB reports do not record any attendance or statements by an attorney at all, let alone legal advice.

Second, the County waived the privilege by twice failing to properly assert it. Despite a direct order from the district court to identify the reports' recipients, the County failed to identify who attended the relevant CIRB meetings and all of the individuals who received the CIRB reports on its privilege log. Without this information the court below could

not properly assess whether all elements of the privilege were established.

Third, the majority has offered no basis to order that the entirety of the CIRB reports be withheld from production. The CIRB reports contain much information that is undeniably not privileged, including information that is publicly available. Ninth Circuit precedent provides that the proper remedy is to redact whatever privileged material is contained in the CIRB reports, not withhold all the CIRB reports in their entirety.

**COUNSEL**

James M. Davis (argued), Leslie E. Hurst, and Timothy G. Blood, Blood Hurst & O'Reardon LLP, San Diego, California, for Intervenors-Appellees.

Jeffrey P. Michalowski (argued), Eric M. Fox, and Carrie L. Mitchell, Quarles & Brady LLP, San Diego, California; Steven E. Boehmer, McDougal Boehmer Foley Lyon Mitchell & Erickson, La Mesa, California; for Defendants-Appellants.

Jaqueline A. Osorno and Sarah Ortlip-Sommers, Public Justice, Washington, D.C., for Amici Curiae Coalition of Press and Open Government Organizations.

**OPINION**

GRABER, Circuit Judge:

Plaintiff Frankie Greer brought this action against the County of San Diego ("County") under 42 U.S.C. § 1983, alleging that he suffered serious injuries while incarcerated in the San Diego Central Jail. After he settled his claims with the County, the San Diego Union Tribune, LLC; Prison Legal News; and Voice of San Diego ("Intervenors") successfully moved to intervene for the purpose of unsealing documents from the County's Critical Incident Review Board ("CIRB") that had been produced in the underlying litigation. The district court ruled that the documents are not protected from disclosure by the attorney-client privilege or under the work product doctrine. We hold that the attorney-client privilege protects the CIRB documents at issue here and, therefore, reverse.[1]

FACTUAL AND PROCEDURAL BACKGROUND[2]

A.  The Critical Incident Review Board

In describing the CIRB's responsibility, the San Diego County Sheriff's Department Policy Manual provides:

> The purpose of this board is to consult with department legal counsel when an incident occurs which may give rise to litigation. The focus of the CIRB will be to assess the

---

[1] Because of our holding we need not and do not consider the work product doctrine.

[2] To the extent that these opinions refer to information that has been filed under seal, no party has requested sealing or redactions, and we hereby unseal that information for purposes of the opinions.

> department's civil exposure as a result of a
> given incident.  The CIRB will carefully
> review those incidents from multiple
> perspectives, including training, tactics,
> policies, and procedures with the ultimate
> goal of identifying problem areas and
> recommending remedial actions so that
> potential liability can be avoided in the
> future.

(Emphasis added.)  The policy defines "critical incidents" that the CIRB must review to include an in-custody death not resulting from natural causes; a use of deadly force by an employee of the Sheriff's Department; a pursuit resulting in an injury requiring hospitalization or causing major property damage; a death or serious injury resulting from an action by a member of the Sheriff's Department; a "Law Enforcement related" injury requiring hospitalization; discharge of a firearm by sworn personnel; any other incident involving the discharge of a firearm, major property damage, or major damage to a vehicle by a member of the Department; and any other serious incident deemed to warrant review. "Serious injury" is defined to include loss of consciousness, concussion, fracture of a bone, protracted loss or impairment of any organ or "bodily member," a wound requiring extensive suturing, and serious disfigurement.

The Director of Legal Affairs for the San Diego County Sheriff's Department "was the primary architect of the CIRB policy and procedure that has been in place since approximately 2006."  "[T]he CIRB reports have always been treated as protected attorney client communications and maintained in [his] office in the Legal Affairs Section of the Office of the Sheriff. . . . In [this] role on the CIRB board,

[he] provide[d] legal advice, in [his] official capacity as the Chief Legal Advisor for the Sheriff's Department, with the expectation that communications are made in confidence and shall remain so. . . . The focus of each and every CIRB meeting is to assess the Sheriff's department['s] civil exposure as a result of a given incident in anticipation of litigation and to improve service delivery to minimize the potential for future civil exposure."

In 2022, the California State Auditor issued a report, which concluded that the San Diego County Sheriff's Department had failed adequately to prevent and respond to in-custody deaths. In that report, the Auditor wrote:

> The stated purpose of the [CIRB] is to consult with the department's legal counsel when an incident occurs that may give rise to litigation. Therefore it appears that its primary focus is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals. . . . [The CIRB's] ultimate goal is identifying problem areas and recommending remedial actions— such as posting a training bulletin or changing a policy—so that potential liability can be avoided in the future.

*San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody*, California State Auditor Report 2021-109, at 36 (Feb. 2022), http://auditor.ca.gov/pdfs/reports/2021-109.pdf (emphasis added). The Auditor observed that the CIRB "does not review natural deaths [as

distinct from suicides, homicides, and accidental in-custody deaths] in part because the risk of legal liability in those incidents is low," even though natural deaths accounted for about half the in-custody deaths. Id. at 37. The Auditor criticized the CIRB for its failure in many cases even to discuss policies and practices, and the Auditor reported that in only six of eighteen cases considered by the CIRB were substantive changes in policy, procedures, or training made. Id. at 36.

The CIRB consists of four commanders from various divisions of the Department and, importantly, the Chief Legal Advisor. The CIRB is to convene for a preliminary assessment within two weeks of a critical incident. In addition, the CIRB must convene within thirty days of a District Attorney's review letter involving a critical incident and within thirty days of the completion of the investigation of a critical incident. A CIRB meeting occurs in three stages:

> First, Department personnel present factual information regarding the underlying incident, including, in some instances, PowerPoints, to the CIRB members, including the Department's legal counsel. Department employees whose attendance was requested because of their relevant subject-matter expertise (e.g., weapons training unit, in-service training, K-9 unit, etc.) also attend. Next, the Department employees who present the factual information are dismissed from the room and CIRB members, including legal counsel, discuss and address issues with the Department's subject-matter experts. Lastly,

> the subject-matter experts are dismissed from the room and the CIRB members, including legal counsel, engage in further discussions. The [Division of Inspectional Services] DIS Lieutenant is also present to facilitate these communications and to document key issues, comments, and matters for inclusion in the CIRB confidential report.

Within forty-five days after the CIRB meets, the Lieutenant of the Division of Inspectional Services must prepare a report summarizing the actions and conclusions of the board. Among other items, the report must contain findings with regard to any policy violations, training or policy issues, and actions taken by the Department. In addition, "[a] copy of the CIRB Confidential Report and other related reports shall be filed in the Legal Affairs Section, Office of the Sheriff." Additional documents produced by the CIRB include memoranda, records, and reports containing findings about inmate deaths and injuries and summarizing the CIRB's actions and conclusions.

B. Initial Litigation

In February 2019, Plaintiff filed the underlying action against the County and other Defendants[3] alleging that they had violated his civil rights. During discovery, Plaintiff sought production of documents from the County's CIRB meetings—in particular, documents concerning the investigation of twelve in-custody deaths. The County

---

[3] The other defendants were Sheriff William Gore, Alfred Joshua, Barbara Lee, Macy Germono, Francisco Bravo, Christopher Simms, and Michael Campos. But the claims against those defendants were dismissed.

objected.  The County argued, among other things, that those CIRB documents were protected by the attorney-client privilege.  The parties jointly moved to resolve the discovery dispute.  The district court overruled the County's objections.  The County moved for reconsideration.  In the interim, while awaiting the district court's decision on the County's reconsideration request, Plaintiff moved to compel production of the CIRB documents.

The district court denied the County's request for reconsideration.  The court granted Plaintiff's motion to compel, ordering the County to produce the CIRB documents.  The court concluded that the County had "failed to carry its burden of demonstrating [that] the CIRB documents Plaintiff [sought were] protected from disclosure."  The court rejected the County's "blanket assertion that '[a]ll CIRB reports . . . are confidential communications with . . . the department's Chief Legal Advisor and have been prepared at [his] request and review.'"  The court held that the CIRB "serves multiple purposes unrelated to obtaining legal advice from counsel" and rejected the County's effort to "immunize documents from disclosure by simply involving an attorney in the investigation."

The County again moved for reconsideration, but the district court denied that motion.  The district court did, however, agree to review the CIRB documents *in camera* before ordering their production, given the "extremely grave interest at stake."  After conducting its *in camera* review, the court ordered the County to produce to Plaintiff all the CIRB documents (with redactions proposed by the parties), subject to an attorneys'-eyes-only protective order, and it ordered that any filings including or referring to those documents be filed provisionally under seal.  The County petitioned this

court for a writ of mandamus seeking vacatur of the order compelling production of the CIRB documents. This court summarily denied mandamus relief the same day. Thereafter, the County complied with the district court's order and produced the CIRB documents to Plaintiff's counsel. In opposing the County's pending motion for summary judgment, Plaintiff then relied on portions of the CIRB reports, which he filed conditionally under seal in keeping with the district court's instruction.

C. Intervention

After the district court denied the County's motion for summary judgment with respect to Plaintiff's claims, the parties reached a settlement agreement. About two weeks later, Intervenors[4] filed their motion to intervene pursuant to Federal Rule of Civil Procedure 24(b) and to unseal the CIRB documents for "public inspection." Intervenors argued that the documents "will assist the public in understanding the reason for the high rate of injuries and deaths of those in the Sheriff's custody and are needed to hold the Sheriff's Department accountable to the public." The district court granted the motion by oral order and ordered the parties to "meet and confer regarding proposed redactions in accordance with the Court's oral order." The County produced the CIRB documents to Intervenors, and the parties discussed proposed redactions. The district court then entered a written order, granting the motion to intervene and denying the County's request to stay the order pending appeal. The County timely appeals.

---

[4] Intervenors are "news organizations that have reported on the San Diego County Sheriff's Department, including the deaths and injuries of inmates in the Sheriff Department's care."

STANDARDS OF REVIEW

We review de novo questions of mootness. United States v. Golden Valley Elec. Ass'n, 689 F.3d 1108, 1111 (9th Cir. 2012).

Similarly, we review de novo "rulings on the scope of the attorney-client privilege," United States v. Graf, 610 F.3d 1148, 1157 (9th Cir. 2010) (citation and internal quotation marks omitted), and waiver of the attorney-client privilege, United States v. Sanmina Corp., 968 F.3d 1107, 1116 (9th Cir. 2020).

With respect to the question whether the attorney-client privilege applies to a particular communication, our court has stated two different standards of review. In In re Grand Jury, 23 F.4th 1088 (9th Cir. 2021), we wrote that the question whether the attorney-client privilege applies to specific documents represents "a mixed question of law and fact which this court reviews independently and without deference to the district court." Id. at 1091 (quoting United States v. Richey, 632 F.3d 559, 563 (9th Cir. 2011)) (internal quotation marks omitted); see also United States v. Ruehle, 583 F.3d 600, 606 (9th Cir. 2009) ("whether [a] party has met the requirements to establish the existence of the attorney-client privilege is reviewed de novo"). This standard appears to trace its origin to Tornay v. United States, 840 F.2d 1424 (9th Cir. 1988), in which we held that the district court's conclusion that certain documents were "not a confidential communication protected by the attorney-client privilege is a mixed question of law and fact, and reviewed *de novo*." Id. at 1426. But in Sanmina, we stated that "[w]e review for clear error a district court's factual findings for attorney-client privilege." 968 F.3d at 1116.

We need not try to reconcile our precedents here, because our conclusion would be the same under either standard of review. Nor do we express any view on which formulation is preferable. As noted in our discussion below, the district court made significant legal errors and, in addition, its finding concerning the primary purpose of the CIRB is illogical, implausible, and without support in the record. See Graf, 610 F.3d at 1157 ("A finding is clearly erroneous if it is illogical, implausible, or without support in the record.").

## DISCUSSION

A.  The Appeal Is Not Moot.

Intervenors argue that this appeal is moot because "[t]he County elected to produce the purportedly privileged CIRB documents . . . ." They argue that "the alleged harm from disclosure has already occurred" and, therefore, no recourse exists to remedy the harm. Intervenors are mistaken.

"A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." City of Erie v. Pap's A.M., 529 U.S. 277, 287 (2000) (brackets and some internal quotation marks omitted) (quoting County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)). Addressing issues regarding documents that have been produced pursuant to a court order, the Supreme Court in Church of Scientology of California v. United States, 506 U.S. 9 (1992), held that "a court may not be able to return the parties to the status quo ante," because there is "nothing a court can do to withdraw all knowledge or information," that a party may have acquired by examining documents or other material produced in compliance with a court order. Id. at 12. But in circumstances such as these, "a court can fashion some form of meaningful relief"; it has the "power to effectuate a partial remedy by ordering [Intervenors] to

destroy or return any and all copies [they] may have in [their] possession." Id. at 12–13 (emphasis omitted); see id. at 13 (further holding that the "availability of this possible remedy is sufficient to prevent [a] case from being moot"); see also Golden Valley, 689 F.3d at 1112 ("A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." (citation and internal quotation marks omitted)).

Intervenors rely on earlier case law from this court, but their reliance is misplaced. We rejected those decisions as to the question of mootness because they conflicted with later Supreme Court precedent:

> We have previously recognized that Church of Scientology is controlling on this issue. See United States v. Rubin, 2 F.3d 974, 976 (9th Cir. 1993). We take this opportunity to further clarify our case law. We conclude that the Supreme Court's decision in Church of Scientology is "clearly irreconcilable" with our prior decisions listed above. See Remark v. United States, 979 F.2d 770, 771 n.1 (9th Cir. 1992); EEOC v. St. Regis Paper Co.-Kraft Div., 717 F.2d 1302, 1303 (9th Cir. 1983); United States v. Silva & Silva Acct. Corp., 641 F.2d 710, 711 (9th Cir. 1981); SEC v. Laird, 598 F.2d 1162, 1163 (9th Cir. 1979). The fact that these cases arose under different federal statutes does not distinguish them from Church of Scientology. Church of Scientology, 506 U.S. at 17 (relying on

"earlier cases involving other statutes" to hold the appeal not moot).

Accordingly, we hold that Golden Valley's appeal is not moot despite Golden Valley's compliance with the district court's order.

Golden Valley, 689 F.3d at 1112–13 (internal citations altered).  All the in-circuit cases that Intervenors cite pre-date Golden Valley.

Because we can order the district court to direct Intervenors' counsel and Plaintiff's counsel to return or destroy their copies of the CIRB documents, particularly given that they received non-redacted versions,[5] effective relief remains available.  The County thus "[has] a concrete interest . . . in the outcome of [this] litigation."  Knox v. Serv. Emps. Int'l Union, Local 1000, 567 U.S. 298, 307–08 (2012) (citation omitted).  Therefore, this appeal is not moot.

B.  The Attorney-Client Privilege Applies.

Generally, "a party asserting the attorney-client privilege has the burden of establishing the [existence of an attorney-client] relationship and the privileged nature of the communication."  Ruehle, 583 F.3d at 607 (emphasis omitted) (quoting United States v. Bauer, 132 F.3d 503, 507 (9th Cir. 1997)).  We apply an "eight-part test" to determine

---

[5] Intervenors received the CIRB discovery under the "'attorneys' eyes only' protective measures so that the parties [could] . . . meet and confer about redactions."

whether the information in dispute is covered by the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

Graf, 610 F.3d at 1156 (citation omitted).

In this circuit, "the primary-purpose test applies to attorney-client privilege claims for dual-purpose communications."[6] In re Grand Jury, 23 F.4th at 1092. The CIRB serves more than one purpose. As the Chief Legal Advisor wrote:

> Conferring with legal counsel regarding potential litigation is one primary purpose of a CIRB. Litigation is almost assuredly going to follow any truly critical event.
>
> A CIRB also serves to review and address department deficiencies in a number of areas

---

[6] By failing to raise the issue properly in a timely manner in the district court, the County waived or forfeited its argument that we should adopt the test set forth in In re Kellogg Brown & Root, Inc., 756 F.3d 754 (D.C. Cir. 2014). See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957 (9th Cir. 1989) ("The rule in this circuit is that appellate courts will not consider arguments that are not properly raised in the trial courts." (brackets omitted) (citation and internal quotation marks omitted)).

> using real facts and circumstances as a catalyst. Several areas lend themselves well to this type of review, including training, tactics, policies, and procedures.

Under the primary-purpose test, "courts look at whether the primary purpose of the communication is to give or receive legal advice, as opposed to business or [other non-legal] advice." In re Grand Jury, 23 F.4th at 1091. Importantly, under our current formulation of the test, "a dual-purpose communication can only have a single 'primary' purpose." Id.

In deciding that the primary purpose of the CIRB, and the documents it generates, is not to obtain legal advice, the district court made two significant legal errors. First, avoiding future legal liability is not necessarily just an "investigative and remedial" purpose. As then-Sheriff William Gore correctly responded to the Auditor's critique, the "CIRB's role of preventing future litigation complements[,] rather than undercuts[,] the Department's goals of improving the health and welfare of incarcerated individuals." When something goes terribly wrong at a jail—such as a non-natural in-custody death or a serious injury—the jail reasonably expects a lawsuit, such as the one here, to follow. Investigation—that is, discovering what happened—is a necessary predicate to assessing liability for that past event and thus is not separate from the provision of legal advice. See Upjohn Co. v. United States, 449 U.S. 383, 390 (1981) (noting that the attorney-client "privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice"). The jail also reasonably wishes to understand not only its

liability for what already happened but also options for avoiding future liability-creating incidents.  A lawyer's recommendations on <u>both</u> liability for past events <u>and</u> avoidance of future liability-creating events constitute legal advice.  <u>See, e.g.</u>, <u>Pritchard v. County of Erie</u> (<u>In re County of Erie</u>), 473 F.3d 413, 419 (2d Cir. 2007) ("Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct.").

Second, the court erred by relying on the purported motive of the CIRB's creator to dress non-privileged communications in privileged garb.  Considering the full context of the quoted magazine article, the court's assertion ascribes a motive that is not present.  The Chief Legal Advisor wrote that, without a consideration of possible organizational changes, "negative conduct is likely to continue, generating <u>increased liability</u> for the agency," as well as other problems.  (Emphasis added.)  He recommended participation by a legal advisor as part of a CIRB because a "legal advisor brings risk/liability perspective to the discussion"—a classic function of legal advice.  The district court seized on the additional phrase that including a legal advisor "potentially provides the ability to protect the confidentiality of the discussion under the cloak of the attorney-client privilege."  There are at least two reasons why this passage does not carry a nefarious connotation.  One, the article concerned CIRBs generally, and the author was not giving definitive legal advice to anyone, especially not knowing how someone else's CIRB would operate.  Two, contextually it is clear that the author used the noun "cloak" in the neutral sense of "something that envelops."  <u>See, e.g.</u>, <u>Cloak</u>, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/

cloak (last visited January 8, 2025); see also Cloak, Merriam-Webster.com Thesaurus, https://www.merriam-webster.com/thesaurus/cloak (last visited January 8, 2025) (listing "cover" or "blanket" as synonyms for "cloak").

More importantly, though, what matters is not what the architect of the CIRB thought, but how the CIRB actually operates. For example, if an attorney-client meeting involves only filling out March Madness brackets, the communication is not privileged even if labeled a legal consultation. On the other hand, if a lawyer-client meeting is labeled purely social, but the lawyer discusses the client's potential liability for a breach of contract, that communication is privileged. The situation here differs markedly from cases in which the protections of the attorney-client privilege have been rejected. See, e.g., United States v. ISS Marine Servs., Inc., 905 F. Supp. 2d 121, 129–30 (D.D.C. 2012) (rejecting a claim of attorney-client privilege where the allegedly privileged audit report was completed without any input whatsoever from counsel, where the audit in question was designed specifically to assist in making a business decision, and where the report was not sent to counsel until two months after completion).

Those two legal errors fatally infected the court's determination that obtaining legal advice (both backward- and forward-looking) is not the primary goal of the CIRB meetings memorialized in the underlying reports. Even if we consider the court's "primary purpose" conclusion as a finding of fact that we review only for clear error, the court's finding is "illogical, implausible, [and] without support in the record." Sanmina, 968 F.3d at 1116 (citation omitted). When an inmate dies in custody from non-natural causes, or when another "critical incident" occurs, litigation is almost guaranteed to follow. Consulting with a lawyer and with the

relevant members of management, along with other employees who have knowledge of the incident, is the natural next step for any entity facing a high probability of being sued.

The district court's conclusion runs counter not only to that reality, but also to the relevant documents.  The first two sentences of Section 4.23 of the Policy Manual state:  "The purpose of this board is to consult with department legal counsel when an incident occurs which may give rise to litigation.  The focus of the CIRB will be to assess the department's civil exposure as a result of a given incident."  The CIRB, by definition, convenes only to assess "critical incidents" that are likely to generate litigation.  And the County's current and former Chief Legal Advisors both averred that consulting with counsel is the primary purpose of the CIRB.

Notably, the dissent discounts the truthfulness of only former Chief Legal Advisor Robert Faigin, and not current Chief Legal Advisor Michael Baranic.  Dissent at 39–40.  Although Baranic assumed his role after the particular CIRB reports at issue were prepared, he stated that he was familiar with those reports, noting that they were subject to "the longstanding protection afforded to the CIRB process and related documents."  He also stated unequivocally that all communications and documents generated as part of the CIRB process are confidential because they occur within the attorney-client relationship and are "for the purpose of obtaining legal advice and assisting Sheriff's Legal counsel in rendering legal advice."

The independent state body that investigated the San Diego County Sheriff's Department for failure to prevent and respond to in-custody deaths also shares this view.  The

State Auditor's Report states the "[p]urpose of [the CIRB] is to assess legal liability." California State Auditor Report 2021-109, at 35. And, as a criticism, it emphasizes that "it appears that [the CIRB's] primary focus is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals." Id. at 36.

Here, the CIRB reports contained in the record meet the criteria for attorney-client privilege. Department Policy required the Chief Legal Advisor to be part of the CIRB, and there is no contention that the Chief Legal Advisor was absent from any of the meetings memorialized in the reports. In each instance, areas of potential liability for the inmate's death were discussed. In most instances, counsel participated actively by asking questions designed to understand and, where appropriate, by highlighting areas of potential liability.

In short, both the participants in the CIRB and its critics consistently viewed the primary purpose of the CIRB as assessing legal liability for a past event and avoiding legal liability for future similar events. The district court's ruling to the contrary was erroneous.

C. The County Did Not Waive the Attorney-Client Privilege.

Intervenors argue, in the alternative, that if the attorney-client privilege applies, "the County never met its burden of establishing that it did not waive that privilege." Specifically, Intervenors assert that (1) the County disclosed the disputed CIRB reports to third parties, but failed in the privilege logs to identify anyone other than the Chief Legal

Advisor as a recipient of those reports,[7] and (2) the County failed to establish an attorney-client relationship with every person who attended the CIRB meetings at issue. Neither claim is persuasive.

As to the first contention, the County identified the Chief Legal Advisor as the only recipient of the disputed CIRB reports because he was, in fact, the only recipient. As his sworn declaration asserted, CIRB reports are "sent to me only and [are] maintained in a confidential file system in the legal affairs unit. The reports are not accessible or disseminated to anyone else in the Department." Additionally, CIRB reports were not distributed to anyone outside the Department except the State Auditor. There is no evidence in the record to the contrary. As to the State Auditor, disclosure of the CIRB reports is required by law, Cal. Gov't Code § 8545.2, but as a matter of law that disclosure is not a waiver: "Providing confidential information to the California State Auditor . . . shall not constitute a waiver of that privilege." Id. § 8545.2(b). To the extent that the district court made a finding that the disputed CIRB reports were sent to someone else, that finding is without support in the record and, therefore, is clearly erroneous.

As to the second argument, Intervenors misconstrue the reach of the attorney-client privilege. The Chief Legal Advisor's declaration stated that he was the legal advisor for the San Diego County Sheriff's Department as a whole, not

---

[7] The district court found the amended privilege log deficient for a different reason: the County's assertion that the attorney-client privilege covered the entirety of the CIRB reports, rather than only the portions specifically containing legal advice. That ruling was erroneous for the reasons explained in Part B, above.

just for the Sheriff alone.  All participants in CIRB meetings are employees of the Sheriff's Department.  And as the Supreme Court's decision in Upjohn Co. established in the context of a corporation, the attorney-client privilege attaches to communications between lower-level employees and the employer's counsel when the employer seeks legal advice for the corporation; otherwise, counsel cannot be fully informed so as to give sound advice.  See Upjohn Co., 449 U.S. at 397 (holding that "the communications by Upjohn employees to counsel are covered by the attorney-client privilege"); id. at 389 (discussing the principle that sound legal advice and advocacy depend on the lawyer's being fully informed by the client).  The same principle applies, for the same reasons, to public entities that are seeking legal advice with respect to official business.

For the foregoing reasons, the attorney-client privilege applies to the disputed CIRB reports.  And the County did not waive that privilege.

**REVERSED and REMANDED with instructions to require the return and/or destruction of the disputed documents, which are privileged.**

GRABER, Circuit Judge, concurring:

I write this concurrence for two reasons. First, I will explore in greater detail how our precedents concerning review of the question whether the attorney-client privilege applies to a particular communication came to be in disarray. Second, I wish to add a real-world perspective to the analysis of the attorney-client privilege.

A. Standard of Review

Our precedents concerning review of the question whether the attorney-client privilege applies to specific documents, held by the district court not to be privileged, are contradictory. In re Grand Jury, 23 F.4th 1088 (9th Cir. 2021), stated that the question whether the attorney-client privilege applies represents "a mixed question of law and fact which this court reviews independently and without deference to the district court." Id. at 1091 (quoting United States v. Richey, 632 F.3d 559, 563 (9th Cir. 2011)) (internal quotation marks omitted). Similarly, we stated in United States v. Ruehle, 583 F.3d 600 (9th Cir. 2009):

> The district court's conclusion that statements are protected by an individual attorney-client privilege is "a mixed question of law and fact which this court reviews independently and without deference to the district court." United States v. Bauer, 132 F.3d 504, 507 (9th Cir. 1997) (quoting United States v. Gray, 876 F.2d 1411, 1415 (9th Cir. 1989)). That is, whether the party has met the requirements to establish the existence of the attorney-client privilege is reviewed de novo. Id. We also review de novo the district

> court's rulings on the scope of the attorney-client privilege. Id. Factual findings are reviewed for clear error. See Al-Haramain Islamic Found. v. Bush, 507 F.3d 1190, 1196 (9th Cir. 2007). A district court's credibility determinations are given "special deference." United States v. Craighead, 539 F.3d 1073, 1082 (9th Cir. 2008) (citing United States v. Nelson, 137 F.3d 1094, 1110 (9th Cir. 1998)).

Id. at 606–07 (emphasis added).

But, by citing both Bauer and Al-Haramain, Ruehle perpetuated a problematic inconsistency. Bauer squarely held that the question whether the party asserting the attorney-client privilege met the requirements to establish both the relationship and the privileged nature of the communication is reviewed de novo, as is the district court's conclusion that a communication is not protected by the privilege. Bauer, 132 F.3d at 507. Inexplicably, Al-Haramain cited Bauer for a proposition that it does not contain: that we review a ruling on attorney-client privilege for "clear error as to factual determinations by the district court, but de novo . . . as to the application of legal principles to those facts." Al-Haramain, 507 F.3d at 1196. And Al-Haramain did not concern the attorney-client privilege; rather, we established the standard of review for a claim under the state secrets privilege and merely analogized, inaccurately, to our earlier precedent pertaining to the attorney-client privilege. Id.

These two standards of review are irreconcilable. If we review "independently and without deference to the district court. . . . [t]hat is, . . . de novo," Ruehle, 583 F.3d at 606, a district court's ruling that the attorney-client privilege does

not protect a communication, we do not give any deference—including clear-error review—to the district court's findings on the subject.

Similarly problematic is the ruling in Sanmina that "[w]e review for clear error a district court's factual findings for attorney-client privilege and work-product doctrine." 968 F.3d at 1116. Sanmina cited Richey, 632 F.3d at 563–64, for this proposition, but it is unclear whether Richey intended the sentence concerning factual findings to be part of, or separate from, the attorney-client privilege. Moreover, Richey cites United States v. Graf, 610 F.3d 1148, 1158 (9th Cir. 2010), which in turn cites Ruehle, 583 F.3d at 606, which in turn—as explained above—incorporates the inconsistency in our precedents pertaining to the standard of review. In re Grand Jury itself is internally inconsistent, asserting that de novo review applies but seemingly engaging in clear-error review and citing Sanmina. In re Grand Jury, 23 F.4th at 1091, 1095.

Although it is difficult to pinpoint exactly how and when the incompatible statements of our standard of review arose, the first case that I have found in this circuit clearly confronting the question is Tornay v. United States, 840 F.2d 1424 (9th Cir. 1988). There, taxpayers argued that the attorney-client privilege protected certain records sought by the IRS. We held that the district court's conclusion that the records were "not a confidential communication protected by the attorney-client privilege is a mixed question of law and fact, and reviewed *de novo*." Id. at 1426. Not long after, Gray followed, again holding without exception that the district court's conclusion that a communication was "not protected by the attorney-client privilege is a mixed question

of law and fact which this court reviews independently and without deference to the district court." 876 F.2d at 1415.[1]

The ruling that Tornay established can be changed only by the en banc court. Hart v. Massanari, 266 F.3d 1155, 1171–72 (9th Cir. 2001). It may be that the standard of review for which the dissent advocates is the better rule. But to date, the process that would allow our court to alter its course has not occurred. This case, though, is not a good vehicle for taking up this issue en banc. In my view, we should await an appeal in which the standard of review matters to the outcome. As the majority opinion explains, whichever standard applies here, the district court's finding about the primary purpose of the CIRB is clearly erroneous; it is illogical, implausible, and without support in the record. I turn next to that topic.

## B. Attorney-Client Privilege

Before becoming a judge, I spent several years as a management-side labor and employment lawyer. In that capacity, I responded to clients whose businesses had experienced personnel problems or industrial accidents. When meeting with such a client, the first step was to investigate and discuss the facts. After that, my advice could take a number of forms: "there is significant potential for

---

[1] A circuit split exists on this issue. The Sixth and Eleventh Circuits, like our earliest cases and some of our later cases, review de novo. United States v. Sadler, 24 F.4th 515, 556-57 (6th Cir. 2022); In re Grand Jury Matter No. 91-01386, 969 F.2d 995, 997 (11th Cir. 1992). The First, Fourth, and Fifth Circuits use the hybrid approach advocated by the dissenting opinion. LLuberes v. Uncommon Products, LLC, 663 F.3d 6, 23 (1st Cir. 2011); Hawkins v. Stables, 148 F.3d 379, 382 (4th Cir. 1998); Taylor Lohmeyer Law Firm P.L.L.C. v. United States, 957 F.3d 505, 509 (5th Cir. 2020). If and when our court takes up this issue en banc to resolve the intra-circuit split, the inter-circuit split will remain.

liability, so consider a settlement"; "you do not face realistic exposure because you followed all statutes and policies correctly"; "some company policies should be revised to prevent a similar problem from arising again in the future"; "I don't know the answer until we investigate further"; and so on.  These meetings, and the documents memorializing what took place at them, were entirely privileged whether I wrote the notes or the client did, and whether or not I recommended revisions in the client's policies and procedures.  Such recommendations, made in the context of assessing and advising a client about a potentially liability-generating event, are not, as the dissent would have it, "non-legal purposes."   Dissent at 39.

The dissent's proposed analogy to advice from a driving instructor or an accountant, Dissent at 34–35, is not persuasive, because lawyers' communications are privileged.  It is true, for instance, that if an accountant had given my client the same advice that I did, the accountant's advice would not be protected by a privilege.  But that fact says nothing whatsoever about whether the advice that I communicated was protected by the attorney-client privilege.

Similarly, the dissent's observation that the documents at issue "were not even prepared by an attorney," Dissent at 35, is irrelevant.   If the client wrote notes to record what happened at our meeting, that document would be just as privileged as my own notes, provided that it was not given to a third party.[2]  That is exactly what occurred here.  And

---

[2]  The dissent asserts that the privilege was waived.  Dissent at 42–47. But for the reasons given in the majority opinion, that contention rests on a misunderstanding of the record, which establishes that only the lawyer received the CIRB reports, and on a misunderstanding of the

the CIRB reports are just as privileged as the notes from my meetings with my clients.

---

KOH, Circuit Judge, dissenting in part:

I respectfully dissent. Whether the attorney-client privilege applies here presents a straightforward question of fact: Was the primary purpose of the Critical Incident Review Board ("CIRB") process to seek legal advice or some other non-legal purpose? The district court made the factual finding that the primary purpose of the CIRB process was not to provide legal advice, but instead to improve the operation of the County's jails. This factual finding was not clearly erroneous but, to the contrary, was supported by ample evidence in the record, including the County's policy manual, statements by County officials and, most importantly, the CIRB reports themselves.

But in my view, we do not even need to reach the question of what the primary purpose of the CIRB reports may have been because the County failed to properly assert the privilege. The County failed to identify all of the individuals who received the CIRB reports and who attended the relevant CIRB meetings on its privilege log, despite a direct order from the court to identify the reports' recipients. Without this information the court below could not properly assess whether all elements of the privilege were established. By failing to provide it, the County waived the privilege.

Finally, even assuming the privilege had been properly asserted, the County has offered no compelling explanation

---

scope of the privilege, which applies to all employees of the Sheriff's Department.

as to why the entirety of the CIRB reports must be withheld. Those reports contain much information that is indisputably not privileged. At the very least, that information should be disclosed.[1]

## I.  Primary Purpose

The district court correctly found that the CIRB reports were not privileged because their primary purpose was not to obtain legal advice. "[T]he attorney-client privilege extends only to communications made 'for the purpose of' facilitating the rendition of professional legal services.'" *In re Grand Jury*, 23 F.4th 1088, 1092 (9th Cir. 2021) (quoting *United States v. Rowe*, 96 F.3d 1294, 1296 (9th Cir. 1996)). Because the attorney-client privilege stands as "an obstacle to the investigation of the truth," it must "be strictly confined within the narrowest possible limits consistent with the logic of its principle." *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) (Friendly, J.) (quoting 8 Wigmore, Evidence § 2291); *see United States v. Christensen,* 828 F.3d 763, 803 (9th Cir. 2015) ("The scope of the privilege should be strictly confined within the narrowest possible limits." (internal quotation marks omitted)). The privilege "applies only where necessary to achieve its purpose." *Fisher v. United States*, 425 U.S. 391, 403 (1976). Where a communication has both a legal and non-legal purpose, as is the case here, the court must determine whether the "primary purpose" of the communication was to seek or provide legal advice. *In re Grand Jury*, 23 F.4th at 1092-94. "[A] dual-purpose

---

[1] I agree with the majority that this case is not moot and join the portion of the majority's opinion as to mootness. I also agree with the majority that the County waived or forfeited the argument that we should adopt the test set forth in *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754 (D.C. Cir. 2014).

communication can only have a single 'primary' purpose." *Id* at 1091.

"We review for clear error a district court's factual findings for attorney-client privilege . . . ." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020). "A finding is clearly erroneous if it is illogical, implausible, or without support in the record." *Id.* (quoting *United States v. Graf*, 610 F.3d 1148, 1157 (9th Cir. 2010)). Our Court has twice held that a district court's conclusions about the primary purpose of a dual-purpose communication are among the factual findings subject to such clear error review. *See id.* at 1118-19 (applying clear error standard to district court's determination that the primary purpose of a dual-purpose communication "was to obtain a non-legal valuation analysis from DLA Piper, rather than legal advice"); *In re Grand Jury*, 23 F.4th at 1095 ("[T]he district court did not clearly err in finding that *the* predominate purpose of the disputed communications was not to obtain legal advice . . . ." (citing *Sanmina*, 968 F.3d at 1119)). We are not at liberty to deviate from this on-point precedent.

The cases cited by the majority to suggest that a de novo standard may be applicable, Majority at 13, did not involve the question of how a district court's findings about the primary purpose of a communication should be reviewed, and so cannot overcome this more specific (and more recent) precedent. But more fundamentally, I disagree with the majority that applying a deferential standard of review to this primary-purpose determination is inconsistent with the more general rule that application of the attorney-client privilege to a particular communication presents a mixed question reviewed de novo. *See United States v. Ruehle*, 583 F.3d 600, 606-07 (9th Cir. 2009). Determinations of "basic or historical fact—who did what, when or where, how or

why"—are reviewed for clear error, even if application of the law to those facts may be a mixed question. *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 394 (2018) (internal quotation marks omitted). Identification of the primary purpose of a communication fits comfortably within the realm of the purely factual. *See Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982) ("Treating issues of intent as factual matters for the trier of fact is commonplace."). And even if this primary-purpose determination were, itself, a mixed question of law and fact, a deferential standard of review would still be appropriate given the fact-bound nature of the inquiry. *See U.S. Bank Nat. Ass'n*, 583 U.S. at 395-96 (holding that "the standard of review for a mixed question all depends on whether answering it entails primarily legal or factual work" (cleaned up)); *Fon v. Garland*, 34 F.4th 810, 817–18 (9th Cir. 2022) (Graber, J., concurring) ("[I]f answering the mixed question is primarily factual, then we review with deference to the fact-finder.").

Applying the primary purpose test, the district court concluded that legal advice was not the primary purpose of the CIRB reports, but instead "a tertiary and incidental goal."[2] The district court identified several non-legal purposes of the CIRB reports that predominated, including identifying violations of Department policy to be referred for further investigation, identifying ways to improve the Department's policies and training, and promoting accountability and public trust in the Sheriff's Department.

---

[2] In keeping with the majority's nomenclature, references to the "district court" include both the magistrate judge's initial order directing production of the CIRB reports and the district court's subsequent decision adopting it.

In essence, the district court found the primary purpose of the CIRB was not to obtain legal advice, but rather to investigate ways to improve the operations of County jails.

## A.  The District Court Committed No Legal Error.

The majority identifies two purported legal errors in the district court's reasoning. Majority at 18-20. In my view these were not errors, let alone legal ones. Instead, the majority simply disagrees with the district court's factual findings.

*First*, the majority asserts that "avoiding future legal liability is not necessarily just an 'investigative and remedial' purpose." Majority at 18. But whether a communication helps to avoid future liability is not the test for privilege. A driving instructor who advises their student on how to avoid getting a ticket does not give legal advice, an accountant who advises a company about internal audit procedures to avoid securities law violations does not give legal advice, and "normal tax return preparation assistance— even coming from lawyers—is generally *not* privileged," even though erroneous tax preparation can result in substantial liability. *In re Grand Jury*, 23 F.4th at 1095 n.5. As these examples illustrate, what matters is not the ultimate aim of avoiding liability, but rather whether *legal* advice is sought or obtained to achieve that goal. *See Sanmina*, 968 F.3d at 1116; *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) ("What matters is whether the lawyer was employed with or without reference to his knowledge and discretion in the law, to give the advice." (internal quotation marks omitted)). Investigative and remedial measures, even if carried out by an attorney, are not privileged insofar as they involve business advice rather than legal advice. *See Rowe*, 96 F.3d at 1297 ("Where the attorney [is] asked for

business (as opposed to legal) counsel, no privilege attache[s].”); *see, e.g.*, *In re Polaris, Inc.*, 967 N.W.2d 397, 410-11 (Minn. 2021) (concluding that a report prepared by attorneys was not privileged where its “primary purpose . . . was setting corporate policy” even where a portion of the report “focus[ed] on compliance with federal regulations”); *Marceau v. I.B.E.W.*, 246 F.R.D. 610, 613-14 (D. Ariz. 2007) (concluding that audit report prepared by attorneys was not privileged because “[t]he co-mingling of the purposes of the audit between identifying improved business operations and obtaining legal advice to this degree vitiates the protection of the attorney-client privilege”).

Here, contrary to the County’s suggestion, the district court did not simply “assum[e]” that “training and remediation have nothing to do with legal advice.” Rather, the district court *found* a near-complete absence of legal advice in the CIRB reports at issue, which were not even prepared by an attorney. The district court further found, as a factual matter, that “the primary purpose of these documents is for investigative and remedial purposes *in order to increase accountability and public trust*,” whereas “obtaining legal advice is a tertiary and incidental goal of these CIRB memoranda.” This is not a legal conclusion but a factual finding that is reviewed for clear error. *See Sanmina*, 968 F.3d at 1116, 1118-19 (“[T]he district court’s finding that [defendant’s] purpose was to obtain a non-legal valuation analysis from DLA Piper, rather than legal advice, was not clearly erroneous . . . .”).

*Second*, the majority disagrees with the district court’s reliance on a remark by Robert Faigin—the former legal advisor to the Department and the “architect” of the CIRB process—in which he suggested that including a lawyer in the CIRB meetings had the benefit of “potentially

provid[ing] the ability to protect the confidentiality of the discussion under the cloak of the attorney-client privilege." The district court reasonably inferred from this statement that an attorney was included in the CIRB process not primarily to provide legal advice, but instead to potentially shield the discussions from disclosure. The majority offers an alternate reading of Faigin's statement in an attempt to show why it "does not carry a nefarious connotation." Majority at 19. But offering an alternative interpretation of the evidence does not demonstrate the district court committed clear error, let alone that any error was legal, as opposed to factual, in nature. *See Chaudhry v. Aragon*, 68 F.4th 1161, 1171 (9th Cir. 2023) ("[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985))).

The majority claims that "what matters is not what the architect of the CIRB thought, but how the CIRB actually operates." Majority at 20. But Faigin's statement speaks directly to how the CIRB actually operates. Faigin not only designed the CIRB process but was also the only attorney who attended CIRB meetings. Insofar as Faigin believed at the outset that his role in the CIRB was not primarily to provide legal advice, one can reasonably infer that only limited legal advice was actually offered. And more fundamentally, this statement by Faigin was far from the only evidence on which the district court relied.

## B.  The District Court's Factual Findings Were Not Clearly Erroneous.

Even in the absence of legal error, the majority insists that the district court's factual findings are clearly erroneous

because they "run[] counter" to "relevant documents" and the "reality" that the County faced a high risk of litigation. Majority at 21. As an initial matter, the district court found, based on its *in camera* review, that the CIRB reports contain only "small snippets of legal advice." Even a cursory review of the CIRB reports reveals that this finding was correct. None of the CIRB reports contain *any* assessment of the County's potential liability for the underlying events. To the extent the reports reflect discussions of potential reforms to County policies and training, the discussions were dominated by non-lawyers and did not concern the law. Faigin rarely spoke at those meetings, and even when he did, he rarely gave legal advice. Indeed, three of the CIRB reports do not record *any statement* by Faigin at all, let alone any legal advice.[3]

The majority does not engage with the content of the CIRB reports themselves and instead relies on extraneous documents characterizing the purpose of the CIRB, namely the Sheriff's Department's policy manual, the Faigin declaration, and the State Auditor Report. But as discussed below, these documents come nowhere near demonstrating that the district court's findings were clearly erroneous, *i.e.*, "illogical, implausible, or without support in the record." *Sanmina*, 968 F.3d at 1116.

*First*, the assertion in the Sheriff's Department's policy manual that the purpose of the CIRB is to assess legal

---

[3] Indeed, to date the County failed to produce attendance sheets for two of these CIRB meetings (despite the fact that the reports list such a roster as among the attachments). Significantly, neither the County's privilege logs nor any of the supporting declarations the County submitted actually state that an attorney was in attendance at either of these meetings, as is required to establish the privilege. Accordingly, there is no evidence that Faigin or any other attorney was present at either of these meetings.

liability and consult with counsel is an unsupported legal conclusion that is no different than an "attorney-client privilege" stamp on an email or document. *Cf. United States v. Fluitt*, 99 F.4th 753, 764 & n.7 (5th Cir. 2024) (finding that inclusion of "attorney client privileged and confidential" in email subject line is insufficient to establish email was privileged). Far more probative is the actual operation of the CIRB which, as set forth in the policy manual, involved a multitude of non-legal tasks unrelated to any assessment of civil liability. According to the manual, the CIRB reports are to be prepared by a non-lawyer from the Sheriff's Department's Division of Inspectional Services ("DIS") and must "summariz[e] the actions and conclusions of the board" concerning a variety of non-legal matters. But nowhere does the manual require that the CIRB reports contain any assessment or findings about the County's potential legal liability or legal compliance.

The County claims that the CIRB process is limited to circumstances that present a uniquely high risk of litigation, but that alone says nothing about whether legal advice was actually provided. And more to the point, a CIRB meeting is required in many circumstances where the litigation risk is limited, including after any "[d]ischarge of a firearm by sworn personnel," regardless of whether injury results, and following "[a]ny other incident involving the discharge of a firearm, major property damage, or major vehicle damage by a member of this Department or other critical incident which, in the judgment of the Sheriff, Undersheriff, Assistant Sheriff, or board member warrants review." [4] The fact that the CIRB convenes even in the absence of a substantial risk

---

[4] Indeed, one of the CIRB reports at issue concerned an individual whose death resulted from natural causes.

of liability supports the contrary inference that its purposes extend beyond obtaining legal advice.

*Second*, the district court was under no obligation to credit the declaration of Faigin in light of the contrary evidence in the record.[5] This is particularly true because there were reasons to doubt Faigin's credibility. Faigin's declaration in support of the County's privilege claim stated, "[t]he reports are a record of legal advice sought from, and provided by, me." And yet, the district courts *in camera* review revealed the reports contained only "small snippets of legal advice," and several reports did not contain any statement by Faigin at all. Further, as noted, Faigin previously authored an article about the CIRB process in which he suggested that a lawyer was being included to "potentially provide[] the ability to protect the confidentiality of the discussion under the cloak of the attorney-client privilege." And this is not the only statement in the article that conflicts with Faigin's declaration. The article identified a multitude of non-legal purposes of the CIRB, such as improving "training, tactics, policies, and procedures," "meet[ing] the public's expectation of effective self-policing," and avoiding "negative public perception, and potential government intervention." The article concludes with the following observation:

---

[5] The declaration of Michael Baranic, the current Chief Legal Advisor to the County, says nothing about whether these CIRB reports are privileged because Baranic assumed his role well after the relevant CIRB meetings took place. Baranic's declaration does not establish how, if at all, he had any personal knowledge concerning the relevant period. And regardless, the district court was not required to credit his declaration in light of the other evidence in the record.

> A successful CIRB process will ultimately provide an agency with constantly updated training and thorough incident review. Byproducts of the CIRB process also include increased accountability and reduced numbers of future critical incidents. Reduced civil liability and improved public perception round out the reasons for ensuring that every agency has a well-formulated CIRB process.

Consistent with the district court's findings, this article confirms that "[r]educed civil liability" "round[ed] out" the purposes of the CIRB but was not its primary purpose.[6]

*Third*, the State Auditor's Report is at best marginally relevant. Whether the primary purpose of a communication is legal advice, such that the privilege applies, is a question for the courts to resolve, and the generic statement by a state agency not even involved in this litigation is hardly dispositive.[7] It is also important to understand the full

---

[6] It is noteworthy that "[r]educed civil liability" is at the end of this list, and is treated as a separate objective from training, increased accountability, and improved public perceptions. Even Faigin apparently agreed with the district court that avoiding future liability is a separate and distinct objective from any "investigative and remedial" purposes of the CIRB.

[7] Indeed, it is not even clear the State Auditor reviewed any of the CIRB reports at issue. The State Auditor apparently reviewed a sample of only 18 CIRB reports, but (because of the County's deficient privilege log) it is not clear whether any of the CIRB reports at issue here were included in that sample. The County's original and amended privilege log gave no indication that any of the CIRB reports at issue here were included in the sample. Faigin's declaration suggested the CIRB reports generally may have been shared with the State Auditor, but did not state whether the specific CIRB reports at issue actually were.

context of the statements in the Audit Report. The State Auditor was not praising or endorsing the County's position that the CIRB reports were privileged, but rather criticizing this position and the resulting lack of transparency. The Audit Report ultimately recommended that "the Legislature . . . require the Sheriff's Department to either make public the facts it discusses and recommendations it decides upon in the relevant [CIRB] meetings or . . . establish a separate public process for internally reviewing deaths and making necessary changes."

The County's letter responding to the State Auditor is revealing. In it, the County argued that no reforms to County policies were needed because the CIRB is capable of performing the oversight function the State Auditor deemed lacking. In advancing this argument, the County conceded that the CIRB serves the non-legal purpose of "improving the health and welfare of incarcerated individuals." To address this apparent contradiction, the County argued in its letter that avoiding future litigation through privileged legal advice and improving service delivery are not mutually exclusive objectives, a view that the majority endorses. Majority at 18. But when it comes to the attorney client privilege, the practical compatibility of these distinct objectives is irrelevant. "[A] dual-purpose communication can only have a single 'primary' purpose," and here the district court found that the primary purpose was not obtaining legal advice. *In re Grand Jury*, 23 F.4th at 1091. The County has failed to demonstrate that this finding was "illogical, implausible, or without support in the record," and thus has failed to establish clear error. *Sanmina*, 968 F.3d at 1116 (citation omitted).

## II. Waiver

Even setting aside the primary purpose issue, I would affirm the district court's alternate finding that the County waived the privilege by failing to properly assert it. The County, as the party invoking the attorney-client privilege, bore the burden of establishing all of the elements of the privilege were satisfied. *See Ruehle*, 583 F.3d at 609; *Clarke v. Am. Com. Nat. Bank,* 974 F.2d 127, 129 (9th Cir. 1992). "One of the elements that the asserting party must prove is that it has not waived the privilege." *Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981). To establish its claim of privilege, the County was required to "describe the nature of the documents" being withheld "in a manner that, without revealing information itself privileged or protected, [would] enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(ii).

The County's initial privilege log provided almost no information to justify application of the privilege. It stated each CIRB report was to "SLA Faigin" and was from "DIS," and justified application of the privilege by stating each CIRB report "contain[ed] analysis and legal assessment." [8] The magistrate judge found this privilege log to be inadequate because, among other things, it failed to identify "all individuals listed as receiving a copy of the document and their relationship to the County" and failed to identify the attendees of the CIRB meetings.

The magistrate judge gave the County an opportunity to produce an amended privilege log, but the County failed to correct these deficiencies. The County's amended privilege

---

[8] As to one of the CIRB reports, the initial privilege log failed even to state that it "contain[ed] analysis and legal assessment."

log provided no further details about the contents of the CIRB reports, did not identify all the recipients of the CIRB reports, and did not identify any of the participants in the CIRB meetings.

Although the amended privilege log suggested that Faigin was the "only recipient," that statement is at best ambiguous and at worst untrue. For starters, the accompanying declaration submitted with the privilege log seems to suggest that the CIRB reports were shared with the State Auditor.[9] Whether or not disclosure to the State Auditor waives the privilege, the failure to list the State Auditor as a recipient on the privilege log demonstrates the log was not intended to include all individuals who received the CIRB reports. Similarly, the declaration indicates the reports were sent to Faigin only "[a]fter each report is approved by my client," thereby conceding that other individuals within the Department (whose names and roles are not specified) were privy to the documents before they were ultimately sent to Faigin. Indeed, the amended privilege log states the CIRB reports are from "DIS," but does not identify who at DIS actually prepared them or how many individuals within DIS (or the Department) actually viewed the CIRB reports before they were "sent" to Faigin for storage.[10]

---

[9] The declaration is, admittedly, ambiguous as to whether the specific CIRB reports at issue were disclosed to the State Auditor or whether the State Auditor reviewed other CIRB reports.

[10] The fact that the CIRB reports were eventually sent to legal counsel and stored by the legal department does nothing to demonstrate the applicability of the privilege. *See* 2 Paul B. Rice et al., *Attorney-Client Privilege in the U.S.* § 7:2 (Dec. 2023) ("In those instances where in-house counsel has been designated the official records custodian, this should pose little difficulty for courts. The applicability of the attorney-

On appeal, the County attempts to excuse its failure to identify the recipients of the CIRB reports and the attendees at the CIRB meetings on the grounds that any recipients or attendees would have been employees of the Sheriff's Department, and so would not have broken the privilege. The majority endorses this view, Majority at 23-24, but it is simply not the case that disclosure of a communication to an organization's employee can never waive the privilege.

To maintain the confidentiality of a communication, and hence its privileged status, the communication may be distributed only to those individuals within an organization who "need to know" its contents to facilitate the provision of legal advice or who are "authorized to speak or act for the" organization. *F.T.C. v. GlaxoSmithKline*, 294 F.3d 141, 147 (D.C. Cir. 2002) (internal quotation marks omitted); *see Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980) ("The test . . . is whether the agency is able to demonstrate that the documents . . . were circulated no further than among those members of the organization who are authorized to speak or act for the organization in relation to the subject matter of the communication." (internal quotation marks omitted)); Restatement (Third) of the Law Governing Lawyers § 73 cmt. g ("The need-to-know limitation . . . permits disclosing privileged communications to other agents of the organization who reasonably need to know of the privileged communication in order to act for the organization in the matter.").[11] Courts

---

client privilege turns on the substance and context of the communications, not the fact of who possesses them.").

[11] Contrary to the majority's contention, Majority at 24, *Upjohn* did not hold that all communications between a corporate employee and counsel are always privileged. Rather, *Upjohn* rejected the "control group" test the lower court had adopted, but explicitly declined to set forth an

routinely hold that the privilege is waived where a supposedly privileged communication is shared within an organization in violation of this limitation. *See, e.g.*, *Melendres v. Arpaio*, 2015 WL 13649412, at \*5 (D. Ariz. Apr. 2, 2015) (holding that sheriff's department waived privilege over documents shared with Deputy Chief of Detention where department failed to show the subject matter of the communication was "part of the scope of his duties" or that he had any "demonstrable need to be privy to" it); *Revelry Vintners, LLC v. Mackay Rest. Mgmt. Grp., Inc.*, 2024 WL 3280012, at \*5 (E.D. Wash. Apr. 2, 2024) (finding that disclosure of information in email to IT department waived the privilege).

In light of this limitation, the proponent of the privilege must identify each individual that received the communication in question in their privilege log and offer sufficient information to demonstrate that disclosure of the communication to that recipient did not waive the privilege. As a leading treatise explains:

> The privilege proponent must adequately explain each distributee's relationship to [the] communication's content in order to successfully assert his claim. . . . Adequate

---

alternative test for determining when communications with a corporate employee are privileged, leaving that matter for subsequent case-by-case development. *See Upjohn Co. v. United States*, 449 U.S. 383, 396-97 (1981); *Admiral Ins. Co. v. U.S. Dist. Ct. for Dist. of Arizona*, 881 F.2d 1486, 1492 (9th Cir. 1989) ("The Court [in *Upjohn*] . . . declined to establish an all-encompassing test for application of the attorney-client privilege to corporations."). *Upjohn* did not address the waiver issue present here because the confidentiality of the documents at issue in that case was not in dispute. *See Upjohn*, 449 U.S. at 396 n.5.

explanation necessitates disclosure of the identity of each distributee, including her title and responsibilities to the entity that she represents. The prevailing "subject matter" test demands that the privilege proponent prove that each individual receiving the communication had corporate responsibilities that relate to the substance of the communication. Merely stating in a supporting affidavit the conclusion that distribution has not been made beyond those with a need to know in the scope of their employment responsibilities is not sufficient. The proponent must provide enough evidence to permit the judge to come to that conclusion as the judge is the sole independent finder of facts.

2 Paul B. Rice et al., *Attorney-Client Privilege in the U.S.* § 11:6 (Dec. 2023) [hereinafter Rice et al., *Attorney-Client Privilege*] (footnotes omitted).

By failing to identify all of the individuals who attended the CIRB meetings and who reviewed the CIRB reports, the County failed to provide the court below with sufficient information to determine whether the privilege applied. If, for example, anyone who wished to attend a CIRB meeting was welcome, and employees who were not necessary to provide legal advice were present, then any discussions during those portions of the meeting would not have been privileged. Similarly, any indiscriminate dissemination of the CIRB reports within the Department before they were sent to Faigin had the potential to waive the privilege. The County failed to carry its burden of establishing that the

communications remained confidential and accordingly waived the privilege.

## III. Scope of Privilege

The County's position in this litigation is all the more remarkable for the breadth of the claim of privilege being asserted. The County does not simply claim that those portions of the CIRB reports that reflect legal advice are privileged. Instead, the County argues that the entirety of all of the CIRB reports, including all of their attachments, are privileged, without regard to their contents.[12] Even accepting that small portions of the CIRB reports reflect legal advice, as the district court acknowledged was the case, that is no basis to accord protection to the entirety of the CIRB reports, as the majority does through its ruling today.

"The scope of the privilege should be strictly confined within the narrowest possible limits." *Christensen,* 828 F.3d at 803 (internal quotation marks omitted). Accordingly, "[i]f the nonprivileged portions of a communication are distinct and severable, and their disclosure would not effectively reveal the substance of the privileged legal portions, the court must designate which portions of the communication are protected and therefore may be excised or redacted (blocked out) prior to disclosure." *Id.* (quoting Rice et al., *Attorney-Client Privilege, supra*, § 11:21). The party asserting the privilege must, "if necessary, . . . segregate the

---

[12] Indeed, when questioned about this claim at oral argument, counsel for the County adopted the extraordinary position that even the "To" and "From" line of the CIRB reports, and who was in attendance at the meetings, are privileged, notwithstanding the fact that this information was (or should have been) included on the County's privilege log.

privileged information from the non-privileged information." *Ruehle*, 583 F.3d at 609.

Whole swaths of the CIRB reports are plainly not privileged. Each report contains a summary of the County's factual investigation, including publicly available information that is not privileged such as the date of the individual's arrest, the offense for which the individual was arrested, and the jail where the individual was held. *See Upjohn*, 449 U.S. at 396 ("[The client] may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." (quotation omitted)). Most reports contain a list of who attended the CIRB meeting in question that is not privileged. *See Dole v. Milonas*, 889 F.2d 885, 889 (9th Cir. 1989) ("[T]he general rule is that [the] identity of an attorney's clients is not a matter within the attorney-client privilege."); Rice et al., *Attorney-Client Privilege, supra*, § 11:6 ("Neither the identification of documents nor the identity of individuals involved in allegedly privileged communications is information that is protected by the attorney-client privilege."). Each report contains much crosstalk amongst the board members or witnesses that had nothing to do with the law and in which Faigin did not participate that is not privileged. *See Matter of Fischel*, 557 F.2d 209, 212 (9th Cir. 1977) ("An attorney's involvement in, or recommendation of, a transaction does not place a cloak of secrecy around all the incidents of such a transaction."); *Brinckerhoff v. Town of Paradise,* 2011 WL 2926936, at *3 (E.D. Cal. July 15, 2011) (explaining that "[e]ven assuming that a primary purpose of the management meeting was to have the ability to seek legal advice," the court must "differentiate those communications amongst management which recount/discuss attorney advice as

opposed to discussion reflecting management decisions" because "not all communications at a meeting [with lawyers present] are automatically privileged"). Each report contains a description of remedial measures ultimately taken or not taken by the CIRB at the conclusion of the process, including the votes of each member of the board, that are not privileged. *See* Rice et al., *Attorney-Client Privilege*, *supra*, § 5:14 ("The privilege does not extend to opinions and decisions made by the client based on the legal advice the client received."); *Matter of Fischel*, 557 F.2d at 212.[13] Neither the County nor the majority offer any compelling reason why these non-privileged portions of the reports are inextricably intertwined with what little privileged material there is in them. Accordingly, the proper remedy was to redact, not withhold, the reports.

---

[13] Indeed, in responding to attacks on the CIRB process by the State Auditor, the County explained that "[a]ny changes to Sheriff's policies, procedures, training, or education" that are adopted by the CIRB "are published and available for the public to access on the Sheriff's Department's website."